May it please the Court. My name is Martha Rickey with the Northwest Immigrant Rights Project, representing the petitioner Mr. Mondaca. I would seek to preserve one minute for rebuttal. This case is about evidence. The issue here is whether the District Court's findings and conclusions are based on the evidence and reasonable inferences drawn from the evidence and robust enough to justify stripping Mr. Mondaca of his adult children into turmoil. Who is Mr. Mondaca? More to the point, has the government met their rebuttal burden to bring forward clear, unequivocal, and convincing evidence to show that he is not who he says he is? The government has not carried this heavy burden. Well, the record seems to show that Mondaca-Vega used the name Salvador consistently for the first 30-plus years of his life. So why isn't that clear and convincing evidence? Well, the record is not that clear, Your Honor. The record shows that he also used a Jose Valdez-Vega alias. He was he applied for a Social Security number as Reynaldo in 1953. The record isn't clear that the use of Salvador is consistent. Well, I guess so, but that's sort of a double-edged sword in the sense that when then you say that he used three names, you know, most of us would choose one and maybe have a nickname. So that doesn't really help his credibility. Well, right. And when he says I really am Reynaldo, when he used three names and went through deportations under the Salvador name. Well, we're not disputing that he used aliases and that he was deported under aliases on several occasions. That's not in dispute. What is in dispute is which ones are aliases and which ones are, which one is not. So the, in view of the fact that he undeniably used several names, the district court had to figure out which one to believe. Right. Well, there's no documentation that links the petitioner, Mr. Mondaca, with any of the documentation for Salvador, meaning the Mexico birth certificate or the Social Security application record that's on file. Mr. Mondaca has never used or claimed the Mexico birth certificate. The INS went out in 1973, went out looking for that certificate, found one, but Mr. Mondaca has never even known of its existence. There's no evidence of that. Yeah. There are conflicts, but the district court heard all of that. And so I guess my question with them would be, is the district court obligated to accept Mondaca Vegas' assertions that he's Reynaldo when he admits that he used Salvador but offers no good reason for why he did so? Well, Your Honor. I mean, that's what, you know, that's essentially what it has to, you know, it has to be. Well, Your Honor, he did offer reasons for using Salvador or for acquiescing in being labeled with an alias when he was hopefully wishing to or unable to assert his true identity as Reynaldo. For example, the Respondent makes quite a bit of the 1954 sworn statement that he signed as Salvador Mondaca. This ignores the practical obstacles that he faced in asserting his true name, Reynaldo. After the first deportation, the government knew him as Salvador, and he would have been pegged with that alias every time they ran his fingerprints. Well, I'm just wondering, let's say the government had lost and the government were standing where you are right now, and the evidence being the state of what it is, it would sort of be like I would be asking the government the same questions. Why was the district court – why does the district court have to accept your interpretation of the facts when the district court heard all of it and made certain findings and believed in – did not believe your client? Well, what's the standard of review? Well, the standard of review in this case is clear, unequivocal, and convincing evidence, and I would argue that that standard requires objective evidence, that it's not – it's not amenable to the kind of evidence that requires a probability finding, for example, or a plausibility finding. That's not unequivocal. There is no evidence, no documentary evidence that any other Reynaldo exists. The district court has to make a finding based on clear and convincing evidence, but once the district court says that's the standard that I, district court, am applying to make findings A, B, and C, then what is our review of A, B, and C? Isn't it for clear error at that point? Well, you – under Limvey-Mitchell, you have the authority to reexamine the facts in a special circumstances case such as this one, where there have been prior agency findings that Mr. Mondaca is a United States citizen and decades of reliance by his family members in their own citizenship that they derived through him. Also under Lim, this Court is enabled to or allowed to make an independent determination as to whether the government introduced or whether, excuse me, the evidence introduced by the government was in fact clear, unequivocal, and convincing. Well, let's say that, I mean, the other people that got derivative citizenship and all of that, they're not – that's not at stake here, is it? Well, if Mr. Mondaca is found to not be a citizen, then the derivatives or his children who derived citizenship through them would certainly be at risk of losing their citizenship. Have they said that to you? Has who said that to me? The government. The government has not indicated that. However, at trial, when questioning the – Mr. Mondaca's daughter, Consuelo, the government attorney did seem to make it clear that basically she should have been shaking in her boots at the news that his passport had been revoked and whether or not we had in fact consulted or advised her as to what might be the consequences of her father losing his citizenship status. If I may. This case is – What was your client's initial burden? Pardon me? What was your client's initial burden? He was required to come forward in the de novo trial with prima facie evidence of citizenship, and he did so with his California birth certificate, the agency determination that he was a citizen in 1977 when it approved his family petitions, and also his U.S. passport that was reissued as late as 2005. That was his prima facie evidence of citizenship. How about his Social Security? The Social Security, it could be an evidence or evidence of citizenship. Certainly, he's been using that Social Security number. The judge thought you had to show a birth certificate to get Social Security. Well, it's unclear. It's unclear. It's unclear what was required in the mid-1950s to apply for a Social Security number, that the district court's finding was based solely on the immigration judge's recollection of his personal experience. Mr. Court found he met his burden there and then shifted it to the government, correct? Well, I got my – I got my Social Security. His prima facie burden, correct. I got my Social Security card in the late 30s when I was about, well, let's see. Probably about 15, and he just went in and got it. I got it at the Los Angeles Coliseum when I was working there. Right. That may well have been Mr. Mondaca's experience. I didn't have to bring anything. But we don't know because the government did not present any evidence to show. The judge is just speculating. Correct. That's our – that's our view. And that kind of speculation abuses his discretion to make a finding based on that kind of speculation. What evidence is that there's more than one person? None that I'm aware of or that the government has presented. There's one Reynaldo. Well, there's the two birth certificates. So there's two birth certificates. Mr. Mondaca, Reynaldo, has never used or claimed the Mexico birth certificate. He certainly has used and claimed the California birth certificate, and nobody else has. But then didn't he have an affidavit before then where he said he was born in Mexico? That was the 1954 sworn statement that was taken by the same immigration officer who had interrogated him the year previously as Salvador, which was – Well, I guess my question is, is there not an affidavit in the record where he claims that he was born in Mexico? That would be the 54 – Right. The answer is yes on that. Yes. So the district court had to look at that with everything else, too. And that was one of the things the district court found that weighed in favor of how the district court decided. He gave a reason for that. He did give a reason that the district court did not consider. And his reason was that he was in jail, he had no documents, no way to prove his true identity and citizenship, and his friends advised him to just go with the alias and get out of here and we can stay together, travel together, and he won't be locked up in jail. So that was his reason. The district court did not consider that reason. Or if it did, found it implausible. So he got out? Without considering his history as a migrant farm worker. He got out and crossed the border. He did. He did. Right away. That's right. Now, has the government come up with any evidence as to whether there's another Reynaldo Mondaca who was born in Imperial County? They found a person like that? There is no other Reynaldo. There's no evidence of any other Reynaldo. And the petitioner has been reporting earnings, for example, since 1955, and it appears that he presented his California birth certificate to INS at the border as early as May of 1952. Have you seen the birth certificate? Pardon me? Have you seen the birth certificate? I've seen the certified copies that are in the government's file. There's several. They've pulled it numerous times. It's a contemporaneous authentic California birth certificate. They used to have a footprint on them. Not this one. This was signed off by the doctor that attended the birth. What? It was signed off by the doctor, the physician who attended the birth. There's no fingerprint, footprint, or any other of that sort? Not on the birth certificate, no. I see that I'm out of time. Thank you. Thank you. I'm just getting started. May it please the Court, Kate Gettle for Respondent, Attorney General Eric Holder. Petitioner attempts in vain to peck away at the district court's trial order, but this court need not even look past the undisputed evidence in this case to affirm the district court. It is undisputed that the petitioner used the name Salvador Mondaca Vega. It is undisputed that petitioner allowed himself to be deported. It is undisputed the petitioner accepted voluntary departure to Mexico on numerous occasions. It's undisputed that he grew up in El Fuerte, Mexico. It's undisputed that there is a birth certificate for Salvador Mondaca Vega registered in El Fuerte, Mexico. And it's undisputed that the petitioner's fingerprints match those of Salvador Mondaca Vega's. Based on this undisputed evidence alone, the court can affirm the district court's determination that the petitioner is not a U.S. citizen, but rather is Salvador Mondaca Vega a Mexican national. What evidence is there in the record as to how he came into, I'm going to call him the petitioner since he uses different names at different times, that he, how he came into possession of this birth certificate of Ronaldo? There, we don't have much evidence in the record to show how he came into, how he came to possess this birth certificate, and that's been one of the questions in this case. Nevertheless, the fact that he signed a sworn statement in 1954 saying that he's Salvador Mondaca Vega and that all of those facts match the fact that there is a birth certificate for Salvador Mondaca Vega in Mexico is clear, convincing, and unequivocal evidence that he is a Mexican national. Counsel, I could not find, and maybe it's just that it's been a little while since I've looked at the district court's opinion, but the spelling of Ronaldo on the birth certificate and the spelling that the petitioner uses are quite different for the name Ronaldo. Is that a factor in the district court's thinking? And if it is not, is it something that should matter to us? It did not appear to be a factor in the district court's thinking, but yet it is one more issue that calls into question whether this was truly, this California birth certificate truly belonged to the petitioner. But, yes, you're right, Your Honor, there was differences in spelling. We don't know. Is there anyone else that it belonged to? The government believes that there is another Ronaldo Mondaca Carlone. On that birth certificate, does it give the name of the mother, the father? Yes, it gives the name of the mother and father. Marin Mondaca and Antonia Carlone. He's 81 right now, so we don't have the petitioner's 81, whoever he is, right? And so there aren't parents left, correct? Correct. And during his 2010 deposition, we sought to get more information about how he grew up and more information about his immediate family, people he might have known back in El Fuerte. However, he couldn't even tell us the last time in terms of decades when he spoke to his brothers. He couldn't tell us when his parents passed away, the last time he talked to them. He couldn't tell us where they lived. He assumed they still were in Mexico, but he couldn't tell us very many specific details, which made it extremely onerous for the government to seek out these individuals and to find more information about them. Additionally, his daughter, when she testified, had little to no information about her father's family. She didn't even know her grandparents' names. They'd never sent her a birthday present, a Christmas card.  I'm sorry, Your Honor? I said, I don't know my grandparents' names. I know some, but I don't know. Well, in this ‑‑ Well, she was found to be credible, just not probative or just not that relevant, right? Correct. Whereas he was found to be not credible. Correct. The implausibilities in his story and the inconsistencies in his story led the district court to believe that his version of the events just wasn't to be believed. And as Your Honor was saying earlier, when the district court is presented with two different versions of the events, this court's job isn't to second guess a reasonable adoption of one of those versions of the events. Now, his wife is deceased now, correct? And so what came in was her prior testimony, which the district court found to be there was inconsistent on that one statement she said, well, he was born on the ranch, but then she said he was at one point, and the ranch was in El Fuerte or whatever, but then also then she said, no, he lived on the ranch, but he was born elsewhere. And the district court found that, didn't find that explanation satisfactory? Am I correctly reiterating the district court's view of that? That's correct. The district court found that the internal inconsistencies with that statement, the fact that she twice said it was the ranch where he was born and raised in Mexico and then said, no, no, no, no, he was actually born in California, the court found that troubling and didn't find her credible. You conceded that the district court speculated on a few things, correct? Correct, but there were also inferences that were based on reasonable facts in the record, and it was an impermissible speculation, but trying to string together what happened in the 1950s based on the evidence, the documents, and the facts that were in the record, and through that the court was able to figure out what happened here, or the best it could, and determine that he was not a United States citizen. Well, the district judge, he speculated that it was highly improbable that he had a birth certificate in his possession when he left the United States. In 1953? Yeah. Correct. You know, 1953, the borders were pretty well open, and people would come and go. And then he speculated that you need a birth certificate to get the Social Security card, and that he didn't have time to travel to El Fuerte. So that's another speculation. And the important... And it goes on and on. The important point here, Your Honor, is that the district court found that the petitioner wasn't presenting his birth certificate when he was detained and deported by INS and when he accepted voluntary departure. Now, petitioner's version of the facts is that he obtained that birth certificate in 1951 from his mother in El Fuerte, Mexico. Now, let's just say that that's what really happened, that still leaves the huge issue of why he wasn't presenting that birth certificate. Whether he received it in 1951, as petitioner says, or 1953, we still had two deportations in 1954 where there is no indication that the petitioner presented his birth certificate. To the contrary, in September of 1954, he didn't just not present his birth certificate and didn't argue that he's a U.S. citizen, but rather he signed a sworn statement saying, I am Salvador Mondaca Vega, I am a Mexican national, and he gave a birth date very close to the birth date on that Mexican birth certificate. He said he did that because he wanted to get out of custody? Well... Is that what... His testimony... Was that the explanation? Excuse me. Wasn't it? His testimony at trial was that he was only deported once, or he kind of waffled on it. He first said once and he said a number of times, but it appeared that that excuse that he wanted to get out of jail went to his first time he was deported in 1951. He doesn't really give any sort of explanation about that 1954 sworn statement. Furthermore, the Court should note that when the petitioner first testified under oath, it was in 1998 at the Immigration Court, when asked why he was using this name and why he was allowing himself to be deported, he didn't give an explanation back in 1998 when his memory was fresher. It wasn't until he was deposed and then again at trial that we first are hearing this story about how he wanted to get out of jail sooner. So if the Court is to believe any story, you know, the district court just found these inconsistencies too much to grant him credibility and to believe his story. But the fact remains that we don't know who the real, if there is another, Rinaldo Mondacco. We don't know that. Correct. We don't, we don't know much about the. He's got the power to find that out. Who, who can find that out? We can find that out. Well, we were unable to find that out despite our efforts to try and find information. And again, we tried to. What was his explanation as to how he got the birth certificate? He says that when he was deported the first time, he went back to El Fuerte and that his mother then gave him the birth certificate and then he came back. But importantly, that first deportation was around 1951 and he was deported and accepted voluntary departure many times after that, according to his own admission and his own testimony before the Immigration Court. So Petitioner wants this Court to believe his version of the events and his story about what happened. So these, these folks, they live under a lot of fear and a lot of pressure, even when they're born here. Huh? Even when they're born here, they, they live under that fear. And, and this, this is why things are happening in places like Arizona where some guy, some white guy with a nice suit will stop them and, and they could be citizens, huh, born here, and they'll still walk away because they, they, they fear that confrontation. Do you know that's part of it? Well, in this case, the issue is more that he held himself out as a particular person and that person is known to have been born in Mexico. And he's given no explanation of where that name came from or really any plausible or consistent explanation as to why he used that name. In some of the... But we still don't know. That's the thing that bothers me. You, you've got Rinaldo, and he's probably a pretty old guy now, but you could look for him, you could check it, check him out, check the schools, see if he went to the schools there, who it was. And we were unable to find school records in this case, and it was probably due to the fact that it was, you know, this was a long time ago that he went to school. Well, this was Imperial County, huh? Right? Correct. You know, places like that, they had separate, segregated schools for Mexican kids. They didn't worry about stuff like that. That's, that's another explanation. I have a question. There are four things that I've written down that I think are undisputed, and I'm going to ask the other side, but I want your answer on this. That Mondaca consistently used the name of Salvador in the 1950s. In May 1953, a person named Salvador Mondaca Vega was served with a warrant by the INS,  The fingerprints are those of Mondaca. And three, in September 1954, Mondaca was detained, again fingerprinted, and gave a sworn statement in which he stated that he was Salvador and was born in Mexico on April 16, 1931. And four, in September 1956, Mondaca was granted voluntary departure under the name Salvador. Are those undisputed? Those facts are undisputed, with one minor exception. The district court found, and the parties don't dispute, that it was the petitioner that applied for the Social Security card in 1953 as Reynaldo. That is the only instance in which he used that Reynaldo alias throughout the 1950s, up really until about 1966. So if you look at his FBI rap sheet, it's almost entirely consistent that he was using that Salvador Mondaca name throughout this time period in question. Otherwise, yes, all of those undisputed facts are correct. The fact that he was getting in trouble, that can explain a lot, too. But was he getting Social Security payments? He was. After he got that Social Security card, he was getting Social Security or he was paying into Social Security. What year did he get the Social Security card? 1953. Well, he applied for it in 1953 and presumably got the card shortly thereafter. So he's been paying. He paid into it for quite a period of time. Correct. So he's getting Social Security now. As far as I know, Your Honor, yes. Huh? As far as we know. Did you check it? Well, we tried to gather Social Security records but weren't able to obtain those. Can't get them from the Social Security people? We attempted to, Your Honor. You're the Justice Department. You're supposed to be able to get everything. In sum, this Court should not second-guess the plausible explanations that the District Court found as to what happened in the 1950s. The Court did not clearly err. The standard of review is clear error for the District Court's fact findings. This Court is not in a position to review the evidence anew or to conduct. Part of it was based on speculation. And, you know, what I also wonder about is that, I mean, he made findings of fact, and some of them were based on speculation. But then you come to the ultimate conclusion of citizenship, right? You know?  Well, this Court. You have all the facts. You have all the facts. And from that, you have to make a legal determination. So why isn't this a mixed question of law and fact? Well, the legal issue as to the citizenship was not in dispute. As Your Honor is aware, there's various ways to gain citizenship. The parties here didn't dispute that what was at issue was birthright citizenship, meaning whether or not he was born in the United States. So the question of fact was which birth certificate belonged to him? Correct. A or B. And that's a factual question. Correct. And that was the limited remand purpose for the District Court to determine. And this Court under Section 1252 remanded the case for that particular purpose to do fact-finding related to citizenship. The bottom line, though, is whether he's a citizen by birth or not. Correct. That is the ultimate issue here, Your Honor, which the government's position is that it is a factual determination. Thank you. All right. Go ahead. Stay with it. Thank you, Your Honor. Just a couple of brief points. How old is your client now? Pardon me? How old is he? He's in his 80s. I'd have to do some math to figure. He's 81. 81, yeah. Either way, he's 81, basically. Okay. I think. Right. Now, in terms of the government's contention that the birth date that Petitioner gave in the 1954 statement was close to the date of birth on the Mexico birth certificate, Petitioner has never been able to identify the parents on that birth certificate, the names of the parents, or the precise birth date ever in any sworn statement or documentation that exists in the record. Secondly, the government's contention that your power of review is somehow limited here is belied by Limvey and Mitchell. On review of the district court's findings and conclusions in this case. Is Lim still good law after the Supreme Court's decision in Pullman Standard v. Swint, which came some 12 years after Lim? I believe so. I would have to double-check, but I have not uncovered in my own research anything that would suggest that it's not. We haven't made a decision about it, but that's why it's an open-ended question whether we are still bound by Lim, whether it's inconsistent with later Supreme Court precedent. I don't know. Is it a factual question which birth certificate was his? I don't. Well, yes, it is a factual question, of course. However, he's never used or claimed the Mexico birth certificate. There's nothing that ties it to him. But, yes, it is a factual question. Yes. But the underlying question is, is certificate A his or certificate B his? That's a factual issue. That is a factual issue. Yes. One other thing I'd like to point out, if I have time, is to go back to the daughter's testimony, his daughter Consuelo, in terms of whether he ever gave an explanation about why he wanted to get out of jail. Has he ever voted? Pardon me? Has he ever voted? Not to my knowledge, no. Nothing in the record on that? I'm not aware that he has. His daughter did testify at the deposition that when she paid his bail under the name Salvador, they had him under the name Salvador, and she had to argue to find him. He told her, explained to her what was going on and said that, well, he'd used that name so he could get out of jail soon and travel with a bunch of people that he was with. So in that respect, her deposition testimony corroborates his own testimony in terms of why he used that alias to be released from jail. Thank you. Thank you. All right. Thank you. The matter is submitted. The court will adjourn. All rise.
judges: Pregerson, Graber, Callahan